IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JANE ROE** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | **Civil Action: 1:14-cv-01285 (BAH)** |
| | : | |
| **BERNABEI & WACHTEL, PLLC** | : | |
| *et al.* | : | |
| | : | |
| **Defendants** | : | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION OF DEFENDANTS
BERNABEI & WACHTEL, PLLC AND LYNNE BERNABEI
TO DISMISS PLAINTIFF'S COMPLAINT**</u>

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

ARGUMENT ......................................................................................................................5

I.  STANDARD OF REVIEW ....................................................................................5

II. PLAINTIFF'S COPYRIGHT CLAIMS FAIL AS A MATTER OF LAW .................7

    A.  No Copyright Protection Exists for a Recording Lacking
        Originality or Creativity.................................................................................7

    B.  The Fair Use Doctrine Authorized Defendants' Use
        of the Recording.............................................................................................10

        1.  The First Factor: The Purpose and Character of any
            Alleged Use of the Video is not One against which the
            Copyright Act is Designed to Protect..............................................11

        2.  The Second Factor: The Nature of the Video is not
            "Creative" and Therefore Strongly Favors a Finding
            of "Fair Use".....................................................................................16

        3.  The Third Factor: The Internet Publication was for
            Factual Content, not for any Expressive Content, which
            Supports Fair Use .............................................................................18

        4.  The Fourth Factor: any Alleged Internet or Judicial
            Use would have "Absolutely Zero" Detrimental Effect on
            the Potential Market for the Copyrighted Work .............................19

    C.  Plaintiff Failed to Timely Register with the Copyright Office
        so that Claims for Statutory Damages or Attorneys' Fees are
        Precluded......................................................................................................23

    D.  The Complaint does not Allege that Plaintiff has Sustained,
        or Could Sustain, Actual Damages...............................................................24

III. THE RICO CLAIM FAILS AS A MATTER OF LAW ...........................................27

    A.  Plaintiff Lacks Standing in the Absence of Injury to Business
        or Property....................................................................................................29

B.    There is no Actionable RICO "Pattern" Since Conduct
with Respect to A Single Alleged Scheme And One Alleged
Victim is Legally Insufficient..................................................................................31

A.    Proximate Cause is Fatally Lacking..........................................................34

B.    The Complaint does not Allege a Distinct "Enterprise"..........................36

IV.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY
UNDER THE NOERR-PENNINGTON DOCTRINE.............................................38

V.    DEFENDANTS SHOULD BE AWARDED ATTORNEYS' FEES
AND COSTS..........................................................................................................42

CONCLUSION..................................................................................................................43

782360v.1

## INTRODUCTION

After having unsuccessfully sued the defendants in the D.C. Superior Court for invasion of privacy (among a litany of other torts),[1] plaintiff now brings this federal lawsuit alleging copyright infringement and racketeering in connection with a two-minute cell phone video recording she made in 2012 of her supervisor's allegedly harassing conduct, even though she did not timely register with the U.S. Copyright Office, did not exercise any originality or creativity in the recording, and has not sustained any actual damages. Moreover, her judicial assertions in the Superior Court – in particular, multiple invasion of privacy claims predicated on her intent and desire to keep the video private – belie her present claims. Plaintiff has pled herself out of this Court on the copyright claims, which require that she intend to derive commercial value from marketing the video, not keep it confidential. *See* Plaintiff's D.C. Superior Court Complaint at ¶¶ 32, 44, 49, 55, 86 (Oct. 30, 2013) (attached hereto as Exhibit A); TR. at 76:14-17, 79:3-11, 79:23-25 (Apr. 10, 2014) (excerpts attached hereto as Exhibit B).[2] Without a copyright claim,

---

[1] On October 28, 2013, plaintiff filed in the D.C. Superior Court a multi-count Complaint captioned *Roe v. Bernabei & Wachtel, PLLC, et al.*, Civil Action No. 2013 CA 007393 B, predicated upon the same underlying allegations as the present lawsuit. After oral argument on defendants' Motions to Dismiss, the Superior Court (The Honorable Maurice Ross) on January 31, 2014, dismissed ten (10) of plaintiff's eleven (11) claims – dismissing five (5) of the claims with prejudice (Intrusion upon Solitude; Public Disclosure of Private Facts; False Light; Misappropriation, and Negligent Infliction of Emotional Distress), dismissing three (3) of the claims without prejudice (common law fraud, negligent misrepresentation, fraudulent misrepresentation against defendant Meixin Ren only), and dismissing the two (2) claims brought under the Copyright Act, 17 U.S.C. § 101 *et seq.*, for lack of subject matter jurisdiction, leaving the IIED claim as the only remaining count. Subsequently, on April 10, 2014, the Court granted defendants' Motion for (Partial) Reconsideration and dismissed with prejudice the Intentional Infliction of Emotional Distress claim. Ms. Roe has appealed the decisions to the D.C. Court of Appeals.

[2] It is well-established that the Court, in granting a Rule 12(b)(6) motion, may take judicial notice of procedural developments as well as pleadings in related cases without converting the motion into one for summary judgment. *See Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 107 n.1 (D.D.C. 2008) (citing *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007)) (a court may rely on exhibits that were "public record information" from a party's filing in another matter without converting a motion to dismiss into a motion for summary judgment). Accordingly, in ruling on the motion to dismiss here, this Court can consider developments and filings in the D.C. Superior Court case without converting the motion into one for summary judgment. *Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties."); *Truesdale v. U.S. Dep't of Justice*, 657 F. Supp. 2d 219, 224 n.2 (D.D.C. 2009) ("The Court may take judicial notice of the records of another court."); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004)

1

there is no predicate act for her RICO claim.

In the instant Complaint, plaintiff – who is referred to only by pseudonym – has sued her former co-worker, Meixing Ren, and several other unnamed employees, along with their attorney, Lynne Bernabei and her law firm Bernabei & Wachtel, PLLC (the latter are collectively referred to as "the lawyer defendants") based upon allegations surrounding their legal representation in connection with ongoing federal employment litigation.

Between January 2013 and May 2014, the lawyer defendants brought suit on behalf of Mr. Ren and eight others, current and former employees, interns, and job applicants at Phoenix Satellite Television (US), Inc., the U.S. subsidiary of Phoenix Satellite Television Holdings, Ltd., a major Chinese media conglomerate that also employed plaintiff (collectively, "Phoenix").[3] Plaintiff's 2012 video recording (depicting harassment by a Phoenix supervisor, and which is less than 2 minutes in length, is entirely in Chinese, and does not reveal the faces of either plaintiff or the harasser) is one piece of evidence, among many, of one supervisor's pattern of sexual conduct toward female employees, and which supports the claims of Mr. Ren and his co-workers against Phoenix stemming from retaliation they experienced after assisting plaintiff in her prosecution of an EEOC charge. Moreover, plaintiff's only action in taking the video was to turn on her cell phone recorder during the encounter with her supervisor; the cell phone (which was in her purse) then passively recorded the brief conversation she had with her supervisor. Ms. Roe did not subsequently edit that video. *See* Compl. ¶¶ 19-22 & Exh. 1.

---

("The Court may, however, take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment.").

[3] The lawyer defendants, who specialize in employee-side employment litigation, filed discrimination and retaliation claims against Phoenix on behalf of their clients (not Ms. Roe) in the U.S. District Courts for both the Southern District of New York and the District of Columbia, *Ren, et al. v. Phoenix Satellite Television (US), Inc.*, No. 1:13-cv-01110-TSC (D.D.C., docketed July 19, 2013), *Wang v. Phoenix Satellite Television US, Inc.*, No. 1:13-cv-00218-PKC (S.D.N.Y., docketed Jan. 9, 2013) and *Chang, et al. v. Phoenix Satellite Television (US), Inc.*, No. 1:14-cv-02686-PKC (S.D.N.Y., docketed Apr. 15, 2014) (collectively "the *Phoenix* litigation.").

2

The gravamen of this lawsuit is that the video was disclosed over the Internet after what plaintiff characterizes as "an extremely aggressive public relations campaign against the Employer, which was picked up by numerous media outlets," and was done in connection with and in support of the *Phoenix* litigation. Compl. ¶¶ 6-10, 43-52.

According to the Complaint, plaintiff voluntarily made her initial publication of the video in September 2012, when she sent the video to Mr. Ren by e-mail, Compl. ¶ 29 & Exhs. 3 and 4 thereto, but her transmittal emails provided no instruction from her regarding its use and no direction that the video be maintained as private. *Id.* Her transmittals also make no mention that she claimed, or intended to seek, copyright protection in the recording. *Id.*[4] Ms. Roe further alleges that she provided the video to Mr. Ren by permitting him to back up the file from her iPhone, again without any allegation that she described having a copyright or creative interest in the work. Compl. ¶ 36. The pleadings go on to aver "upon information and belief," that defendants shared the video with others, Compl. ¶¶ 42-56, without specific averment of who did what, when, how often, or for how long. The Complaint also makes vague assertions, again on mere "information and belief," that Ren shared it with his legal counsel[5] and that "Plaintiff *is of the belief* that the video was shared by Ren with numerous other individuals," Compl. ¶ 58 (emphasis added), again with no specifics regarding his conduct.

---

[4] Plaintiff voluntarily provided a copy of the recording to Mr. Ren, played it for another co-worker, and played it for the Equal Employment Opportunity Commission ("EEOC") in connection with her Charge of Discrimination, Compl. at ¶¶ 3, 7, 29-32, 38. There is no suggestion that she ever provided a Form of Notice for Visually Perceptible Copies or that she advised anyone that she claimed a copyright protection in the recording, which lacks any creativity or originality on plaintiff's part. Compl., *passim*; Compl. Exs. 3, and 4. There was no notice for visually perceptible copies, which although no longer required is still recommended, and should contain all the following three elements: 1) The symbol © (the letter "c" in a circle), or the word "Copyright," or the abbreviation "Copr."; 2) the year of first publication of the work; and 3) the name of the owner of copyright in the work, or an abbreviation by which the name can be recognized, or a generally known alternative designation of the owner (for example: © *2011 John Doe*). There was nothing to alert defendants that plaintiff had sought, or intended to seek, a copyright for her passive recording of actual events.

[5] This is an assertion plaintiff simply cannot legitimately make since any communications between the lawyer defendants and their client are privileged and confidential (and to which plaintiff was not privy).

As to the lawyer defendants, the Complaint merely avers that Ms. Bernabei issued a press release on July 22, 2013 in both English and in Chinese, that the story was covered by five (5) news outlets, and that one website featured an interview with Ms. Bernabei along with the video. Compl. ¶¶ 36-38. The pleadings also allege that the video "partially appears" on WUSA9, Compl. ¶¶ 43, 45-56, with no specifics regarding when or for how long.

Plaintiff has now brought two federal statutory claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and one claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, based upon a contention that she has some kind of copyright protection in the video recording (made and published by plaintiff more than a year before she sought to register it with the Copyright Office) and she claims to be entitled to some undisclosed compensation, even though the Complaint makes no allegation whatsoever that she ever sold or marketed the recording, let alone sustained any lost profit or financial injury.

The copyright infringement claims (Counts 1 and 2) fail because plaintiff cannot overcome the multiple and insurmountable substantive legal hurdles: (1) there is no copyright protection in a recording that lacks originality or creativity; (2) there is no infringement based upon "fair use" as codified in 17 U.S.C. § 107 and in well-established case law; (3) plaintiff failed to timely register with the U.S. Copyright Office, which legally precludes her from seeking statutory damages or attorneys' fees under the Copyright Act; and (4) plaintiff has neither sustained actual damages nor alleged any commercial use of the recording.

The RICO claim (Count 3) fails because: (1) without a copyright infringement, there is no predicate act for a RICO claim; (2) plaintiff lacks standing in the absence of injury to business or property; (3) there is no actionable RICO "pattern" since conduct with respect to one video involving one alleged victim is legally insufficient; (4) Ms. Roe cannot establish either but for or

4

proximate cause of some injuries; and (5) the Complaint does not allege a distinct "enterprise." Finally, all of plaintiff's claims run afoul of the *Noerr-Pennington* doctrine, which provides immunity from statutory liability for those who engage in petitioning activity under the First Amendment, which includes the filing of litigation and related advocacy.

Thus, the Complaint fails as a matter of law and should be dismissed with prejudice.[6]

## ARGUMENT

### I.    STANDARD OF REVIEW

As the U.S. Supreme Court has held in two seminal rulings that strengthened the hand of district courts in weeding out tenuous claims at the pleading stage – especially claims that promise to entail highly intrusive, time-consuming discovery and other pretrial proceedings – to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must set forth a "'claim to relief that is *plausible on its face*.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "plausibility standard" "asks for more than a sheer possibility that a defendant has acted unlawfully," and "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks omitted).

A court may grant a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) if "the plaintiff can prove no set of facts in support of her claim that would entitle her to relief." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). It is well settled that a claim

---

[6] The lawyer defendants also adopt and incorporate as if fully set forth herein, the Motion to Dismiss filed by Defendant Meixin Ren. As demonstrated therein, this Court should also dismiss Ms. Roe's Complaint, pursuant to Fed. R. Civ. P. Rules 12(b)(1) and 12(h)(3) for lack of subject matter jurisdiction, because her counsel never moved for leave to proceed under a pseudonym in this Court, so that there is no known plaintiff before this Court over whom jurisdiction can be exercised. The lawyer defendants also join in Mr. Ren's request that this Court deny any future, belated request by plaintiff to proceed anonymously.

757874v.1

must be dismissed "simply because it is patently obvious that [plaintiff] could not have prevailed on the facts alleged in his complaint," and, as the Supreme Court has made clear, if plaintiffs cannot "nudge[] their claims across the line from conceivable to plausible." *Rodriguez v. Editor in Chief*, 285 Fed. Appx. 756, 759 (D.C. Cir. 2008) (citations and internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570).[7] The "Court need not . . . accept inferences that are unsupported by the facts set out in the complaint . . . [or] legal conclusions cast in the form of factual allegations." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007) (citations omitted); *see also Jia Di Feng v. See-Lee Lim*, 786 F. Supp. 2d 96, 101 (D.D.C. 2011).

The Complaint must set forth sufficient information to plead the legal elements of a viable claim for relief, or to permit inferences to be drawn indicating that the *prima facie* elements of a claim exist. *Major v. Plumbers Local Union No. 5*, 370 F. Supp. 2d 118, 128 (D.D.C. 2005) (plaintiffs "must present facts that would establish the elements of each claim"); *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) ("To survive a motion to dismiss . . . plaintiff . . . 'must allege facts that, if true, would establish the elements of each claim' . . . Therefore, 'the Court may explore the plaintiff's *prima facie* case at the dismissal stage to determine whether the plaintiff can ever meet his initial burden to establish a *prima facie* case.").

Here, plaintiff's Complaint does not remotely satisfy the pleading requirements for the essential legal elements necessary to sustain claims for copyright infringement and racketeering,

---

[7] Courts in this Circuit have relied on *Iqbal* and *Twombly* to dismiss complaints advancing a variety of claims. *See, e.g., U.S. ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 882 (D.C. Cir. 2010) (False Claim Act); *Amiri v. Gelman Mgmt. Co.*, 734 F. Supp. 2d 1, 3-5 (D.D.C. 2010) (allegations of discrimination insufficient to avoid dismissal) *aff'd*, 429 F. App'x 17 (D.C. Cir. 2011); *Tooley v. Napolitano*, 586 F.3d 1006, 1007, 1010 (D.C. Cir. 2009) (extensive civil rights complaint failed to satisfy *Iqbal* and *Twombly*); *Guantanamera Cigar Co. v. Corporacion Habanos, S.A.* 672 F. Supp. 2d 106, 108-09 (D.D.C. 2009) (applying *Iqbal* and *Twombly* in "find[ing] that plaintiff ha[d] failed to plead enough factual content " because the complaint "failed to provide sufficient evidence" to satisfy several elements of the proffered unfair competition claim); *Harris v. Koenig*, 722 F. Supp. 2d 44, 49-50 (D.D.C. 2010) (ERISA "complaint must plead facts that are more than 'merely consistent with' a defendant's liability") (quoting *Iqbal*, 556 U.S. at 678).

let alone damages, even under the generous standard of Rule 12(b)(6). *Twombly*, 550 U.S. at

555; *see also Iqbal*, 556 U.S. at 678 ("[T]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice.") (quoting *Twombly*, 550 U.S. at 555).

## II.     PLAINTIFF'S COPYRIGHT CLAIMS FAIL AS A MATTER OF LAW.

### A.     No Copyright Protection Exists for a Recording Lacking Originality or Creativity.

At the outset, there is no basis for asserting copyright protection in a recording of actual

events and one that lacks originality or creativity. In that regard, the subject matter of copyright

law extends to a creative work created by an individual as defined by the Copyright Act.

"Copyright protection subsists, in accordance with this title, *in original works of authorship*

fixed in any tangible medium of expression . . . ." 17 U.S.C. § 102(a) (emphasis added).

The Copyright Act expressly provides that several categories of material are statutorily

ineligible for federal copyright protection. These include works consisting entirely of

information that is common property and containing no original authorship. 37 C.F.R. § 202.1

("The following are examples of works not subject to copyright and applications for registration

of such works cannot be entertained . . . (d) *Works consisting entirely of information that is*

*common property containing no original authorship . . . .*") (emphasis added).[8]

A copyright infringement plaintiff must prove: "(1) ownership of a valid copyright, and

(2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural*

*Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Stenograph L.L.C. v. Bossard Assocs., Inc.*,

---

[8] The mere filing of an application for a copyright certificate does not establish originality. *See Charles W. Ross Builder, Inc. v. Olsen Fine Home Bld'g., LLC*, 977 F. Supp. 2d 567, 581 (E.D. Va. 2013) ("There is no originality analysis prior to issuance of a copyright certificate."); *see also Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 430 (4th Cir. 2010) (stating that any presumption of originality based on the possession of a certificate of copyright registration is "fairly easy to rebut because the Copyright Office tends toward cursory issuance of registrations.") (citation omitted).

7

144 F.3d 96, 99 (D.C. Cir. 1998); *Whitehead v. Paramount Pictures Corp.*, 53 F. Supp. 2d 38, 45-46 (D.D.C. 1999), *aff'd*, No 99-7137, 2000 WL 33363291 (D.C. Cir. Apr. 19, 2000).

The Copyright Act, enacted pursuant to Article I, Section 8, of the Constitution, confers on *creators of original works* a limited monopoly in their works of authorship to advance an important public purpose. "It is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 429 (1984). The reward to the owner is "a secondary consideration" that serves the primary public purpose of "induc[ing] release to the public of the products of [the author's or artist's] creative genius." *Id.* (quoting *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 158 (1948)); *see also Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985).

A copyright gives an author exclusive rights only with respect to his manner of expression. *See, e.g., Superior Form Builders, Inc. v. Chase Taxidermy Supply Co.*, 74 F.3d 488, 492 (4th Cir. 1996) ("the originality inherent in each author's expression is the essence of the proprietary interest protected" so that "independent creation plus a modicum of creativity" is required) (citing *Feist*, 499 U.S. at 346, 348)); *Salinger v. Random House, Inc.*, 811 F.2d 90, 95 *opinion supplemented on denial of reh'g*, 818 F.2d 252 (2d Cir. 1987) ("[a]s with all works of authorship, the copyright owner secures protection only for the expressive content of the work, not the ideas or facts contained therein.") (citing *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976)). This distinction is "fundamental to copyright law and of special significance in determining whether infringement has occurred in a work of biography or other

8

account of historical or contemporary events." *Salinger,* 811 F.2d at 95 (citing *Rosemont Enters., Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir. 1966)).

Because the public has an interest in retaining in the public domain "the right to discover facts and exchange ideas freely," "copyright protection does not extend to ideas or facts even if such facts were discovered as the product of long and hard work. A copyright 'rewards originality, not effort.'" *Superior Form Builders*, 74 F.3d at 492 (internal citations omitted). Moreover, as the Supreme Court has made clear, for copyright purposes, a work of authorship must exhibit some minimal degree of "independent creation plus a modicum of creativity," *Feist,* 499 U.S. at 346, which is wholly lacking here even on the face of the Complaint.

As alleged in Ms. Roe's pleadings, there is no original work and not even a minimal amount of authorship, creativity, or originality in the cell phone video recording that is the subject of this lawsuit. The video does not contain any authorship in the form of original literary, musical, pictorial, or graphic expression. It is clear that, as pled, plaintiff made no attempt to choreograph or direct what was being recorded; instead she merely turned on the camera on her cell phone (which was hidden in her purse), which passively recorded the actual events as they were occurring. Compl. ¶¶ 2, 20-23; Compl. Ex. 1. There was no narrative, music, or editing of the recordation, which simply depicts actual events that transpired at the workplace. *Id.* This is the equivalent of a security camera that merely records anything that happens. *See* Compl. Ex. 1.[9] Indeed, the recording is less than two minutes in length, is entirely in Chinese, does not reveal the faces of either plaintiff or the harasser, and does not show any identifying features of the participants. *Id.* Without the key element of "originality," plaintiff's copyright infringement claims fail as a matter of law.

---

[9] During a hearing on defendants' dispositive motion in the Superior Court case, *see* n.1, Judge Maurice Ross reviewed the video recording twice and made specific factual findings that only "somebody's knees," "shoes," "the floor," "a purse" and "some movement" were visible. *See* TR. at 13:2-7, 29:3-10, 56:14-57:8 (Ex. B).

### B.    The Fair Use Doctrine Authorized Defendants' Use of the Recording.

Leaving aside the lack of copyrightability, there was no infringement as a matter of law based upon the "fair use" doctrine.[10] The copyright "monopoly" – *i.e.*, the "bundle of exclusive rights . . . to publish, copy, and distribute" a creative work, *Harper & Row*, 471 U.S. at 546-47 – is limited and is subject to statutory exceptions, including the exception for "fair use" provided in 17 U.S.C. § 107. *See* 17 U.S.C. § 106; *Sony*, 464 U.S. at 447. Section 107 provides explicitly that "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.[11]

The fair use doctrine recognizes that copyrighted works can be legitimately used by others without a license if the impact of restricting the use of the work would not advance the underlying rationale of granting copyright protection namely, promoting creativity by securing for artists the right to control the exploitation of their works.[12] As such, news reporting, education, criticism, comment and re-purposing are generally considered broad categories of uses that are not infringements of copyright.

An opportunity for a defendant to claim a fair use of copyrighted materials has long been recognized as necessary to fulfill the purpose of copyright, as it was outlined by the Constitution "[t]o promote the Progress of Science and the useful Arts . . . ." *Campbell v. Acuff–Rose Music, Inc.,* 510 U.S. 569, 575 (1994) (quoting U.S. Const., Art. I, § 8, cl. 8). The fair use doctrine

---

[10] "Fair use" is a longstanding common-law principle, now codified in Section 107 of the Copyright Act, that was "traditionally defined as 'a privilege in others than the owner of the copyright to use the copyrighted material in a reasonable manner without his consent.'" *Harper & Row*, 471 U.S. at 549 (quoting H. Ball, Law of Copyright and Literary Property 260 (1944)).

[11] Numerous courts have granted Rule 12(b)(6) motions to dismiss based upon the fair use defense and dismissed copyright infringement claims on the face of the pleadings. *See Faulkner Literary Rights, LLC v. Sony Pictures Classics Inc.*, 953 F. Supp. 2d 701, 712 (N.D. Miss. 2013); *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530-32 (9th Cir. 2008); *Savage v. Council on Am.–Islamic Relations, Inc.*, No. C 07–6076, 2008 WL 2951281, at \*9 (N.D. Cal. July 25, 2008); *Burnett v. Twentieth Century Fox Film Corp.*, 491 F. Supp. 2d 962, 971–72 (C.D. Cal. 2007).

[12] "Creativity for the purposes of fair use is harder to establish than threshold copyrightability." *Fitzgerald v. CBS Broad. Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007).

"permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Id.* at 577 (quoting *Stewart v. Abend,* 495 U.S. 207, 236 (1990)). "The task is not to be simplified with bright-line rules," for the copyright statute, like the fair use doctrine it recognizes, calls for a case-by-case basis applying an "equitable rule of reason" analysis. *Sony*, 464 U.S. at 448 & n.31; *Campbell*, 510 U.S. at 577-78 (citing *Harper & Row,* 471 U.S. at 560).

To guide the determination of whether a particular use is a fair use, Section 107 provides that a court should consider at least four factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit or educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.[13] Applying these four factors, any past or proposed use of Ms. Roe's video recording is a "fair use," as set forth below.

1. **The First Factor: The Purpose and Character of any Alleged Use of the Video is not One against which the Copyright Act is Designed to Protect.**

This Court must first consider "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The inquiry requires a determination of whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is of the type that actually tends to advance copyright's goals of promoting "the progress of science and the useful arts." *See Fitzgerald,* 491 F. Supp. 2d at 184 (citation omitted). As demonstrated, the posting of the video on the Internet by news agencies and informational websites (and its possible use in future court

---

[13] These factors are "not meant to be exclusive," *Harper & Row*, 471 U.S. at 560, but rather "illustrative," representing "only general guidance about the sorts of copying that courts and Congress most commonly had found to be fair uses." *Campbell,* 510 U.S. at 577-78.

11

proceedings) does not impinge on any creative work, was not "transformative," was not for a commercial purpose, and was done in good faith in connection with the prosecution of the *Phoenix* litigation, so that the purpose and use of the video is not protected by the Copyright Act.

This first factor involves consideration of whether the use of the copyrighted material falls into one of the categories enumerated by Congress under Section 107: a) whether the use was "transformative" (*i.e.*, "whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying"); b) whether the use was commercial (namely, "whether it primarily served defendant's private interests rather than the public interest"); and c) whether the defendant acted in good faith when it used the copyrighted material.[14] *See Fitzgerald,* 491 F. Supp. 2d at 184, 190; David Nimmer, *Nimmer on Copyright*, § 13.05[A], at 13–72 (2005). "Fair use presupposes 'good faith' and 'fair dealing.'" *Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (quoting Schulman, *Fair Use and the Revision of the Copyright Act,* 53 Iowa L. Rev. 832 (1968)).

The inquiry into whether a use is "transformative" centers on "whether the new work merely 'supersede[s] the objects' of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell,* 510 U.S. at 579 (quoting *Folsom v. Marsh,* 9 F. Cas. 342, 345 (C.C.D. Mass. 1841)); *see also Los Angeles News Serv. v. Reuters Television Int'l Ltd.*, 942 F. Supp. 1265, 1272-73 (C.D. Cal. 1996), *aff'd in part, rev'd in part on other grounds,* 149 F.3d 987 (9th Cir. 1998) (holding that the retransmitting of news videos of the 1992 L.A. riots without comment, editing, or context was *not* "transformative"). Most often, this is a matter of determining whether the copyrighted work at issue is factual or creative, because, "[i]n general,

---

[14] "The fair use privilege has been applied without question to other publications which have obviously been motivated in part by a desire for economic gain." *Rosemont*, 366 F.2d at 307 (citing *Holdredge v. Knight Publ'g Corp.*, 214 F. Supp. 921 (S.D. Cal 1963) (dealing with an article in a popular magazine)) (other citations omitted).

fair use is more likely to be found in factual works than in fictional works." *Campbell,* 495 U.S. at 237 (citing Nimmer, § 13.05[A] at 13–77 to 13-78 ("[A]pplication of the fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or fantasy"); *cf. Harper & Row,* 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.")).

Here, application of the first Section 107 factor weighs heavily against plaintiff's infringement claim and strongly supports a finding of fair use, since any posting of her video on the Internet by news agencies and informational websites (and its use in future court proceedings) does not impinge on any creative work, was not "transformative," was not for a commercial purpose, and was done in good faith in connection with the prosecution of the *Phoenix* litigation. Defendants did not seek, and are not seeking, to exploit the copyrighted material without paying some "customary price," making the use noncommercial, and therefore plaintiff must demonstrate "either that the particular use is harmful, or that if it should become widespread, it would adversely affect the potential market for the copyrighted work." *Sony,* 464 U.S. at 451. Even assuming for present purposes that plaintiff's work is in any way "original," which it is not, any alleged use of the video is wholly indifferent to plaintiff's "mode of expression" and therefore not within the scope of the protection of the copyright laws.[15] *See Bond v. Blum,* 317 F.3d 385, 395 (4th Cir. 2003) ("fair use" found where the introduction of copyrighted material as an exhibit in a state court proceeding "is indifferent to [plaintiff's] mode

---

[15] Any posting and/or republication of Ms. Roe's video on the Internet by news agencies in connection with interviews and news reports regarding the *Phoenix* litigation and harassment/retaliation falls into the statutory categories protected by the Copyright Act for "criticism, comment, news reporting, teaching, . . . scholarship, or research." 17 U.S.C. § 107. The Internet publication of the recording, along with reports of Phoenix's unlawful and discriminatory conduct, falls under three of those categories: news reporting, as well as encouraging criticism and comment on significant events. As can be seen from the Complaint and the exhibits thereto, the purpose of the posting was to promote a dialogue on important, newsworthy events happening in a major Chinese company. The posting(s) were in connection with news reporting about political and social issues, and therefore "newsworthy" for fair use purposes, and for a use the statute specifically protects. *See* Compl. at ¶¶ 43-56, Compl. Exs. 7, 8, 9, 10. 11.

of expression. Rather, the narrow purpose of defendants' use of the manuscript is for the evidentiary value of its content.").

Here, as in *Bond*, the narrow purpose of any use of Ms. Roe's 2012 video is for the newsworthy and evidentiary value of its factual and historical content insofar as it contains actual events that occurred involving a Phoenix supervisor who engaged in harassing activities towards plaintiff, and which is probative of how the supervisor treated other employees, *i.e.*, Mr. Ren and his fellow co-workers who were retaliated against when they stood up for plaintiff and her right to pursue an EEOC claim, as part of a lengthy pattern of sexual harassment and assault perpetrated against female employees at Phoenix. These are all facts relevant to the discrimination and retaliation issues raised in the *Phoenix* litigation and how a major news organization treats its employees, and any use of the video draws upon the actual events as they occurred, not on plaintiff's "mode of expression." Therefore, any alleged use of the video recording on the Internet or in connection with judicial proceedings was not commercial since it served the public interest in the copyright law and was in good faith. As is clear from the pleadings, any posting on the Internet was in connection with the prosecution of the *Phoenix* litigation, to shed public light on the Company's unlawful employment practices, and without any knowledge that plaintiff sought or intended to seek copyright protection for the video.

As to the purpose and character of use, the Supreme Court in *Harper & Row* considered an infringer's knowing exploitation for economic profit of copyrighted material, which was obtained in an underhanded manner, when it analyzed the defendant's "scooping" of the unpublished manuscript of former President Gerald Ford. 471 U.S. at 562–63; *see also New Era Publ'ns Int'ln., ApS v. Carol Publ'g Group*, 904 F.2d 152, 156 (2d Cir. 1990). That consideration weighed against a finding of fair use -- the magazine "had not merely the incidental effect but the

14

*intended purpose* of supplanting the copyright holder's commercially valuable right of first publication." *Harper & Row*, 471 U.S. at 563 (emphasis in original).

In stark contrast, there is no "intended purpose" or commercially valuable rights in this case with respect to Ms. Roe's video recording and nothing remotely resembling "an attempt to rush to the market just ahead of the copyright holder's imminent publication." *Salinger,* 811 F.2d at 96. Here, any alleged conduct by the defendants bears no similarity whatsoever to the cutthroat commercial practices condemned in *Harper & Row,* where the defendant "knowingly exploited a purloined manuscript." 471 U.S. at 563. Additionally, any alleged use of Ms. Roe's copyrighted work was merely a republication of the video on the Internet, without editing or contextualizing the images, just as the defendant did in *Los Angeles News Serv.*, 942 F. Supp. at 1272-73, which was deemed to be the mere retransmitting of news videos – and non-transformative – and thus protected by the fair use doctrine.

Moreover, the use of Ms. Roe's video would not conceivably harm any potential market for plaintiff's recording (particularly in view of the Superior Court's finding that the video does not have any value, Ex. B at 76:14-17, 79:3-11, 79:23-25). Nothing in the Complaint identifies any harm or potential harm to "her work" against which the copyright law is supposed to protect. Compl. *passim.* The only harm that is alleged is a claim that she has lost the right to control the release of what she describes as "private" or "confidential" information. Compl. ¶¶ 4, 8-10, 27, 39-40. However, the protection of privacy is *not* a function of the copyright law. *See New Era Publ'ng Int'l. ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1504-05 (S.D.N.Y. 1988); *aff'd*, 873 F.2d 576 (2d Cir. 1989). To the contrary, the copyright law offers a limited monopoly to encourage ultimate *public access* to the creative work of the author. If privacy is the essence of plaintiff's claim, then her action must lie in some common-law right to privacy, *not* in the

Copyright Act, *see, e.g., Lawrence v. A.S. Abell Co.*, 299 Md. 697, 699-704, 475 A.2d 448, 450-51 (1984), and the D.C. Superior Court has already dismissed her privacy claims with prejudice as a matter of law. Further, plaintiff's Superior Court Complaint alleged that she planned to keep the video private (Ex. A at ¶¶ 32, 44, 49, 55, 86), so that she has pled herself out of this court, as her prior pleading is an admission that bars any claim that the video had commercial value to her. *See also* Compl. ¶¶ 10, 27, 38-40.

As to this first factor, because there is no market for the video, and any alleged posting of the video or its use in connection with the *Phoenix* litigation was for informational, educational and evidentiary purposes (not a commercial one) and only for its historical and factual content (not for any creative mode of expression), Compl. ¶¶ 9, 43-56; Compl. Exs. 7–11, there is nothing transformative about the nature of the posting of the work, a quintessential part of the fair use analysis. Therefore, this first Section 107(1) factor weighs very heavily in favor of a finding of fair use.

### 2.   <u>The Second Factor: The Nature of the Video is not "Creative" and Therefore Strongly Favors a Finding of "Fair Use."</u>

The second relevant factor set forth in Section 107(2) – the nature of the copyrighted work – focuses on the extent to which a work falls at the core of creative expression. *Campbell*, 510 U.S. at 586. Thus, for example, a fictional work might be closer to the core of creative copyright than a factual work. *See Stewart*, 495 U.S. at 237. That plaintiff's video is unpublished and has no stylized mode of expressing her feelings about historical facts strongly favors a finding of fair use. *Harper & Row*, 471 U.S. at 563-64. Moreover, "application of the fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or fantasy," *Stewart,* 495 U.S. at 237 (citing Nimmer, § 13.05[A] at 13–77 to 13-78), and "[t]he law generally recognizes a greater need to disseminate factual works than works of fiction or

fantasy." *Harper & Row,* 471 U.S. at 563.[16] Here, the video, a purely factual work, lacks any creativity so that its use is justified under the fair use doctrine.

As demonstrated above, *see* Section II(A), there is no creative expression in the cell phone recording, which contains not even a minimal amount of authorship, creativity or originality in terms of literary, musical, pictorial, or graphic expression. As a merely passive recorder of actual events as they transpired, Compl. ¶¶ 2, 24-25, the video lacks any creative expression, which the Copyright Act is designed to protect. The Superior Court found that the video merely showed someone's knees, clothing, and a purse. *See* TR. at 29:3-10, 56:14-57:8 (Ex. B). Moreover, as a purely factual and historical work, any Internet publication or use in court proceedings is protected under the fair use doctrine. *Bond,* 317 F.3d at 396 (for second "fair use" factor, use of manuscript in legal proceedings "is not related to its mode of expression but rather to its historical facts").

Where, as here, the use of the work is *not related to its mode of expression* but rather to *its historical facts* and there is no allegation that the use of the video would adversely affect the potential market for it, the incentive for creativity has not been diminished in any way or in any sense. Even the pleadings make clear that any alleged publication and use of the video on the Internet was in connection with the *Phoenix* litigation, which was for informational and evidentiary purposes, not to take advantage or benefit from any "value" associated with plaintiff, her image (which is not depicted) or any minimal "creative expression" in the recording.

The important societal benefit of having all relevant information on an important social issue presented in a public forum and a judicial proceeding should be furthered particularly where, as here, doing so would not undermine any "creative work."

---

[16] Ms. Roe's attempt to hoard the facts depicted in the video does not promote the goals of the copyright laws since the exclusive ownership of facts does not promote the progress of the useful arts. *See, e.g., Fin. Info., Inc. v. Moody's Investors Serv., Inc.,* 751 F.2d 501, 509 (2d Cir. 1984); *Fitzgerald,* 491 F. Supp. 2d at 187.

### 3.   The Third Factor: The Internet Publication was for Factual Content, not for any Expressive Content, which Supports Fair Use.

The third Section 107 factor examines the "amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3), but even use of an entire publication is fair use in the factual context. The courts must look at the work used, both qualitatively and quantitatively, to determine whether its use was "reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586. "As with all works of authorship, the copyright owner secures protection only for the expressive content of the work, not the ideas or facts contained therein." *Salinger,* 811 F.2d at 95 (citing *Reyher,* 533 F.2d at 90). This distinction is "fundamental to copyright law and of special significance in determining whether infringement has occurred in a work of biography or other account of historical or contemporary events." *Id.* (citing *Rosemont,* 366 F.2d at 306). Here, the use of the video was solely for its factual content, which is justified under the fair use doctrine.

As the Complaint makes clear, there was no "expressive content" – only Ms. Roe's decision to turn the camera on her cell phone on and off. In the absence of expressive content, plaintiff cannot claim copyright over the facts contained in that recording. *See Fuentes v. Mega Media Holdings, Inc.*, No. 09-22979-CIV, 2011 WL 2601356 (S.D. Fla. June 9, 2011) (granting summary judgment under "fair use" doctrine for defendants' use of various scenes from copyrighted work on broadcasts of a news/public interest program, finding little to no expressive content in plaintiff's "home videos" depicting purely factual content); *Fitzgerald*, 491 F. Supp. 2d at 188 (copyrighted photograph of gangster, taken during his arrest, was factual in nature rather than creative, weighing against a determination that broadcast of picture by television station during news broadcast was infringement).

Here, it is conceded that any challenged use of the video either on the Internet or in the

18

federal discrimination lawsuit(s) involves all, or nearly all, of the alleged copyrighted work. Its sole use, however, was not for any expressive content, but rather for its factual content – *i.e.*, to prove (or make more probative) that the supervisor harassed and/or retaliated against other employees who assisted others with their discrimination claims, or have filed discrimination and retaliation claims against the employer in the *Phoenix* litigation. Compl. ¶¶ 6, 9-10, 44-56; Compl. Exs. 7–11. Thus, the use of the copyrighted material in this context, even the entire video, does not undermine the protections granted by the Copyright Act but only serves the important societal interest in having evidence before the public and the legal factfinder. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 526 (1994) ("We have often recognized the monopoly privileges that Congress has authorized, while 'intended to motivate the creative activity of authors and inventors by the provision of a special reward,' are limited in nature and must ultimately serve the public good."); *Bond*, 317 F.3d at 396 (as to third "fair use" factor, defendants' use of copyrighted manuscript in the state court proceeding involved all, or nearly all, of the copyrighted work, was not for its expressive content, but rather for its allegedly factual content, and therefore was not used to undermine any right conferred by the Copyright Act).

Try as she may, plaintiff cannot be permitted to blur the distinction between the copyright protection afforded the "mode of expression" and the ideas and facts in the public domain which are expressed therein, which are not protected by the copyright laws. Because Ms. Roe's video was not used to undermine any right conferred by the Copyright Act, and was instead being used for its factual content to show a serious and prolonged pattern of harassment and retaliation on the part of Phoenix, without regard to any "expressive content," this third factor weighs heavily in favor of a finding of "fair use."

4.  **The Fourth Factor: any Alleged Internet or Judicial Use would have "Absolutely Zero" Detrimental Effect on the Potential Market for the Copyrighted Work.**

The Supreme Court has expressly held that the fourth factor, 17 U.S.C. § 107(4), the effect of any use "upon the potential market for or value of the copyrighted work," is "undoubtedly the single most important element of fair use." *Harper & Row*, 471 U.S. at 566. This is so because it touches most closely upon the author's ability to capture the fruits of his or her labor and hence the incentive "to create." *Id.* at 558. This inquiry considers "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original." *Campbell,* 510 U.S. at 590 (quoting Nimmer, § 13.05[A][4] at 12–102.61); *see also Harper & Row,* 471 U.S. at 569. As to the video at issue, the Superior Court has already found that it has no value, and Ms. Roe has expressly admitted that she had no intention of publicizing or disseminating the video, so that there is no market for the video – warranting a finding in this case that defendants' use had "absolutely zero" effect on the potential market.

Other courts have routinely found that it is "fair use" where a copyrighted work was used in litigation based upon the lack of impact on the marketability of the work's creative value, and therefore no bearing on any interest that the copyright law was designed to protect. *Bond,* 317 F.3d at 397 (holding that it was not copyright infringement to use a copyrighted document as an exhibit in court proceeding based upon "fair use"); *see also Hollander v. Swindells-Donovan,* No. 08-CV-4045(FB)(LB), 2010 WL 844588 (E.D.N.Y. Mar. 11, 2010) (lawyers who used copyrighted essays in two different cases were protected by fair use doctrine because the submission "ha[d] nothing whatsoever to do with any interest that the copyright law was designed to protect") (quoting *Bond,* 317 F.3d at 397) *aff'd sub nom. Hollander v. Steinberg,* 419

20

F. App'x 44 (2d Cir. 2011); *Shell v. Devris*, No. 07-1086, 2007 WL 4269047 (10th Cir. Dec. 6, 2007) (finding fair use because "[w]orks are customarily reproduced in various types of judicial proceedings . . . and it seems inconceivable that any court would hold such reproduction to constitute infringement either by the government or by the individual parties responsible for offering the work in evidence") (quoting Nimmer, § 13.05[D] at 13-91)).

There is nothing in the Complaint to suggest that the video is in any way marketable or that its use in connection with, or as evidence in, the *Phoenix* litigation could adversely affect its marketability. *See* Section II(D) *infra*. Here, both Ms. Roe's present lawsuit and her Superior Court Complaint make clear that she wanted to keep the video private, and not market it. Compl. ¶¶ 10, 27, 38-40; Ex. A at ¶¶ 32, 44, 49, 55, 86. Judge Ross agreed that the video had no value to her. TR. at 76:14-17, 79:3-11, 79:23-25 (Ex. B) (Judge Ross found that "[t]he video doesn't have any value.").

The Fourth Circuit's decision in *Bond* is instructive on this point. The Court held that the use of an autobiographic manuscript as evidence in a child custody case (offered to show that the mother's home was not a suitable place for the children) was fair use because "the use of the work was not related to its mode of expression but rather to its historical facts." *Id.* at 396. The manuscript, which detailed a murder committed by the mother's current husband, was given to several individuals, one of whom gave it to the children's father, whose counsel used it as a deposition exhibit and intended to use it at trial. *Id.* at 391. Before trial, the husband registered a copy of the manuscript with the Copyright Office for the sole purpose of preventing its use at the trial, and thereafter filed a lawsuit for copyright infringement. *Id.* Applying the four fair use factors set forth in Section 107, the Fourth Circuit held that the use of the manuscript was fair use, observing that the "societal benefit of having all relevant information presented in a judicial

proceeding is an important one, it should be furthered if doing so would not unduly undermine the author's rights with regard to his creative work." *Id.* at 896.

Similarly, any use of Ms. Roe's video either as part of advocacy on the Internet or as evidence in the *Phoenix* litigation falls within the scope of fair use authorized by Section 107 of the Copyright Act. The posting of the recording was for the historical facts depicted on it (*i.e.*, the harassment by a Phoenix supervisor), not for any mode of expression. Compl. ¶¶ 6, 9-10, 44-56, 58. As such, the purpose and character of the use has nothing whatsoever to do with any 'creative' interest that the copyright law was designed to protect. Therefore, the effect of any use of the video on the potential market for value of the copyrighted work is absolutely "zero." This is particularly true where, as here, there can be no "market harm" caused by infringement – Ms. Roe expressly disclaimed marketing her video because she belatedly desired to keep it private. *See* Compl. ¶¶ 10, 27, 38-40; Ex. A at ¶¶ 32, 44, 49, 55, 86.

Conspicuously absent from her pleading is any allegation that she has licensed her video to anyone, or made any commercial use of it whatsoever. *See* Section II(D), *infra*. Even considering the Complaint in the light most favorable to plaintiff, there is no allegation about any market harm that could potentially occur if "unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." *Campbell,* 510 U.S. at 590 (quoting Nimmer, § 13.05[A][4], at 13–102.61) (internal quotation marks omitted)).

In sum, consideration of the statutory fair use factors makes clear that the use in 2013 of Ms. Roe's 2012 video constituted "fair use," such that there was no infringement as a matter of law and warranting dismissal of Counts 1 and 2 with prejudice.

**C.      Plaintiff Failed to Timely Register with the Copyright Office so that Claims for Statutory Damages or Attorneys' Fees are Precluded.**

In the alternative, this Court should dismiss the copyright claims because of plaintiff's belated registration of the copyright, which she did only after defendants informed her counsel that the video was not registered. Plaintiff's untimely registration with the U.S. Copyright Office precludes her from seeking or recovering statutory damages or attorneys' fees under the Copyright Act. *See* 17 U.S.C. § 412.[17]

Statutory damages and attorneys' fees are available *only* for acts of infringement that occur *after* the effective date of registration or within a limited time frame after publication. If a published work was infringed before the effective date of registration, those remedies may be available, but *only* if the effective date of registration *is no later than three months after the first publication* of the work. Section 412 of the Copyright Act expressly provides:

> Registration as prerequisite to certain remedies for infringement. In any action under this title . . . *no award of statutory damages or of attorney's fees*, as provided by sections 504 and 505, shall be made for – (1) any infringement of copyright in an unpublished work commenced *before* the effective date of its registration; or (2) any infringement of copyright commenced *after first publication of the work* and *before the effective date of its registration*, unless such registration is made within *three months* after the *first publication* of the work.

17 U.S.C. § 412 (emphasis added); *see also Reed Elsevier, Inc. v. Muchnick*, 599 U.S. 154, 158 (2010) (noting that a registration is "a condition . . . that plaintiffs ordinarily must satisfy before filing an infringement claim and invoking the Act's remedial provisions").

Here, plaintiff did not register the video until October 3, 2013. *See* Compl. ¶ 25; Compl. Ex. 2 (although the exhibit is redacted, the copyright application was submitted by plaintiff under

---

[17] The Copyright Act sets forth two alternative remedies for infringement and provides: "In General. -- Except as otherwise provided by this title, an infringer of copyright is liable *for either* -- (1) the copyright owner's actual damages and any additional profits of the infringer, as provided by subsection (b); or (2) statutory damages, as provided by subsection (c)." 17 U.S.C. § 504(a) (emphasis added).

her real name, not a pseudonym). Yet, plaintiff's *first publication* of the "work" (*i.e.*, the video) was in September 2012, when she gave a copy to defendant Ren, Compl. ¶ 29, with additional publications to "another co-worker" and to the EEOC on at least two other subsequent occasions in 2012. Compl. ¶¶ 31-32, 38. According to the Complaint, any alleged "infringement" is supposed to have occurred more than ten (10) months later in July and August 2013, when the video was given to the lawyer defendants and thereafter to members of the press and news outlets. Compl. ¶¶ 43-46. This in turn resulted in the video having "appeared" on several internet sites and a "microblogging account" in August 2013. Compl. ¶¶ 51-52, 55.

Based upon the Complaint's chronology, plaintiff's 2012 publications pre-date both the alleged infringement (July 2013) and the copyright registration (October 3, 2013), by more than ten months and one year, respectively. Therefore, because plaintiff had not timely registered within three months after her initial publication of the work or prior to the alleged infringement of the work, she cannot meet the statutory prerequisites and is ineligible to recover statutory damages and attorneys' fees as a matter of law. *See* 17 U.S.C. § 412(2). For these reasons, any claim for statutory damages and attorneys' fees must be dismissed with prejudice.

> **D.** **The Complaint does not Allege that Plaintiff has Sustained, or Could Sustain, Actual Damages.**

Even if there had been infringement, and if plaintiff were eligible to recover damages, which she is not (*see* Section III(C) *supra*), Ms. Roe has suffered no actual damages and the Complaint does not aver that the video has commercial value. In that regard, Section 504(b) of the Copyright Act sets forth the parameters for recovering actual damages, including lost profits:

> Actual Damages and Profits.—The copyright owner is entitled to recover the *actual damages suffered* by him or her as a result of the infringement, and any profits of the infringer *that are attributable to the infringement* and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible

24

expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504 (b) (emphasis added).[18]

As a threshold matter, plaintiff's Superior Court complaint expressly argued that she intended to keep the video private and make no use of it after settling her claims – a judicial admission that belies her copyright claim here. When this Court looks at the allegations in the instant Complaint, it will see no claim that plaintiff sustained "actual damages," that she lost any "direct profits," or that the video had any commercial value whatsoever, let alone that plaintiff ever earned any profit from it. Compl., *passim.* There is nothing in the pleadings to suggest that plaintiff ever marketed or sold the recording, earned any revenues, lost sales (whether gross or net sales), or incurred manufacturing, overhead, sales, marketing, or advertising costs. *Id.* In fact, Ms. Roe's express desire was to keep the video private, which forecloses any inference that the video had commercial value.[19] Moreover, it stands to reason that Ms. Roe could not, and would not, disseminate the video for sale given that she pled that she entered into a "private" settlement agreement, Compl. ¶¶ 4, 31-32, which would likely have included a confidentiality provision that would bar her from making any commercial use of the video.

Nor can plaintiff establish any profits earned by the defendants, let alone profits that are directly attributable to use of the video. As statutorily required, in order to establish "the infringer's profits," plaintiff must allege, and ultimately prove, that either the lawyer defendants or their clients somehow "profited" directly from the publication of the video, which Ms. Roe

---

[18] With respect to actual damages that may be recoverable, the profits may be "direct" or "indirect." *Complex Sys., Inc. v. ABN Ambro Bank N.V.,* No. 08 Civ. 7497 (KBF), 2013 WL 5970065, at *2 (S.D.N.Y. Nov. 8, 2013) (citing *Mackie v. Rieser,* 296 F.3d 909, 914 (9th Cir. 2002)).

[19] *See* Compl. ¶ 27 ("Ms. Roe had no interest in publicly disclosing the interaction [harassment] or her video"); *Id.* ¶ 10 (". . . Plaintiff would never agree to have her emotionally scarring sexual harassment video broadcast to the world."); Compl. ¶¶ 38-40 (alleging that plaintiff "was so protective of the video" that she settled her claims against her employer "privately," "did not even display the video to her family members. . ." and "did not use, share, display or publicly release the video for any purpose after her [charge] was settled. . . .").

25

cannot do. She has not alleged that the defendants directly or indirectly earned any revenues or profit "attributable" to the copyrighted work. Compl. *passim*. It is not enough to hypothesize that any public advocacy "was presumably designed to lead to a larger settlement [of the *Phoenix* litigation]" and that "a higher settlement number presumably creates a direct financial benefit to each of the defendants." Compl. ¶ 7. Any possible nexus is far too hypothetical and attenuated.

"The court 'must conduct a threshold inquiry into whether there is a legally sufficient causal link between the infringement and the subsequent indirect profits.'" *Lowry's Reports, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737, 751 (D. Md. 2003) (quoting *Mackie*, 296 F.3d at 915). The court should "deny recovery if the profits 'are only remotely or speculatively attributable to the infringement.'" *Id.* (quoting *Konor Enters., Inc. v. Eagle Publ'ns, Inc.*, 878 F.2d 138, 141 (4th Cir. 1989) (in turn quoting *Frank Music Corp. v. Metro–Goldwyn–Mayer, Inc.*, 772 F.2d 505, 517 (9th Cir. 1985))).

It is wildly speculative and overreaching for Ms. Roe to claim that the recording of the September 2012 events will have any impact, let alone a major and determinative one, on the ultimate outcome of the *Phoenix* litigation. At this juncture, it cannot even be said that the video is an essential piece of evidence necessary to establish that Mr. Ren and his co-workers were harassed or retaliated against. There is ample other evidence, *inter alia* in the form of testimony from numerous past and present Phoenix employees that will prove their case, irrespective of plaintiff and/or her video. Here, there are currently ten plaintiffs in various lawsuits against Phoenix, and yet more witnesses.

Such a wholly remote and speculative damage theory (of some possible link between any future hypothetical monetary settlement of the *Phoenix* litigation and the internet posting of plaintiff's video) should be precluded. *Complex Sys., Inc.*, 2013 WL 5970065, at *2; *Estate of*

26

*Vane v. The Fair, Inc.*, 849 F.2d 186, 190 (5th Cir. 1988) (finding that revenues attributable to the infringement of copyrighted photographs used in a commercial were too speculative and therefore precluded); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001) (no causal connection between the infringement and defendant's profits based on use of plaintiff's copyrighted eyeglasses in an ad campaign); *Mackie*, 296 F.3d at 914-16 (claim for indirect profits too speculative when infringer used copyrighted artwork in brochure aimed at promoting a symphony orchestra, because there are "virtually endless permutations to account for an individual's decision to subscribe to the [orchestra], reasons that have nothing to do with the artwork in question."); *Lowry's Reports, Inc.*, 271 F. Supp. 2d at 751-52 (rejecting claim for defendant's profits because there was only a speculative correlation between the profits and the infringement in connection with broker's use of copyrighted newsletter).

Without any allegations of actual damages, coupled with plaintiff's inability to recover statutory damages, the copyright claims must be dismissed with prejudice.

## III.    THE RICO CLAIM FAILS AS A MATTER OF LAW.

As a threshold matter, since plaintiff cannot plead or prove copyright infringement, there is no predicate act for a RICO claim, which must be dismissed on that ground alone. However, even if this Court were to consider the RICO claim, it must still find that plaintiff has failed to show standing or to state the necessary elements.

"RICO's major purpose was to attack the 'infiltration of organized crime and racketeering into legitimate organizations.'" *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993) (quoting S. Rep. No. 91-617, 91st Cong. 1st Sess. 161, at 76 (1969)); *see also Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 139 (D.C. Cir. 1989),

*modified on other grounds*, 913 F.2d 948 (D.C. Cir. 1990) (Congress enacted RICO "to target . . . the exploitation and appropriation of legitimate business by corrupt individuals").

Although the statute is not limited to organized crime, courts have routinely recognized its potential for abuse "as a springboard for dubious private actions," Hon. Jed S. Rakoff & Howard W. Goldstein, *RICO: Civil and Criminal Law and Strategy*, 1-6 (2010), and have not hesitated to dismiss cases that take "garden variety" disputes and "dress them up as elaborate racketeering schemes." *Uniroyal Goodrich Tire Co. v. Mut. Trading Corp.*, 63 F.3d 516, 522 (7th Cir. 1995); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (affirming dismissal of a RICO claim that was focused on alleged litigation and related acts in connection with a "single scheme, directed at few victims, and resulting in a single, distinct injury.") (quotation marks omitted); *Spoto v. Herkimer County Trust*, Case No. 99-CV-1476, 2000 WL 533293, at *1 (N.D.N.Y. Apr. 27, 2000) ("[T]he civil provisions of [RICO] are the most misused statutes in the federal corpus of law").   Judge Sentelle carefully discussed the sanctionable conduct under Rule 11 and the Rules of Professional Conduct, of filing meritless RICO claims: "If your true motive in couching your complaint in part in RICO terms is to establish a ground on which you can blackmail a defendant out of an otherwise undeservedly large settlement by the threat that they will continue to see themselves written up as 'racketeers,' then I suggest that the pleading may have been 'interposed for [an] improper purpose' such as 'to harass.'" David B. Sentelle, *Civil RICO: The Judges' Perspective*, 12 Campbell L. Rev. 145, 169 (1990) (quoting Rule 11).

Here, plaintiff's Complaint does nothing more than merely cite and quote from the RICO statute – a general definition of "racketeering activity" from Section 1961(1) and the civil

remedies provision of Section 1964(c), Compl. ¶¶ 81-83 – with no elucidation regarding which of the four prohibited types of activities are being alleged. *See* 18 U.S.C. § 1962 (a)–(d). [20]

### A.    Plaintiff Lacks Standing in the Absence of Injury to Business or Property.

As a threshold matter, plaintiff lacks standing to bring her RICO claim (Count 3), because her injuries are personal injuries, not an injury to business or property.

A civil cause of action will lie under RICO for "[a]ny person injured in his business or property by reason of a violation of section 1962. . . ." 18 U.S.C. § 1964(c). [21] This language has been construed as conferring standing required for maintaining a RICO claim. *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985) ("[A RICO] plaintiff only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the [RICO] violation."). The Supreme Court has emphasized that the standing of RICO plaintiffs is a "threshold question" that "represents a jurisdictional requirement." *Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 255 (1994). Litigants who fail to meet the burden of showing that they have standing cannot bring a lawsuit. *Arizonans for Official English v. Arizona,* 520 U.S. 43, 64 (1997); *Hoffman v. Jeffords,* 175 F. Supp. 2d 49, 53 (D.D.C. 2001) ("Moreover, once a court finds that a plaintiff does not have standing to initiate an action, it must dismiss the complaint."), *aff'd,* No. 02-5006, 2002 WL 1364311 (D.C. Cir. May 6, 2002) (*per curiam*).

---

[20] Defendants assume that plaintiff intends to rely on Section 1962(c), which makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering." 18 U.S.C. § 1962(c). To prevail, a person must establish that each defendant has engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Western Assocs. Ltd. P'ship. v. Mt. Square Assocs.*, 235 F.3d 629, 633 (D.C. Cir. 2001) (quoting *Pyramid Sec. Ltd. v. IB Resolution, Inc.*, 924 F.2d 1114, 1117 (D.C. Cir. 1991)). The statute defines "racketeering activity" to include certain enumerated offenses, 18 U.S.C. § 1961(1), and a "pattern of racketeering activity" requires at least two acts of racketeering activity within a ten year period by each defendant. *Id.* at § 1961(5).

[21] Section 1964(c), which creates a private cause of action for violations of Section 1962, limits the universe of potential plaintiffs to "[a]ny person injured in his business or property." 18 U.S.C. § 1964(c).

757874v.1

"The overwhelming weight of authority discussing the RICO standing issue holds that the 'business or property' language of Section 1964(c) does not encompass personal injuries." *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 101 (D.D.C. 2003) (rejecting argument that plaintiffs suffered "business or property" injury by reason of "personal injuries and economic losses derived therefrom") (citing cases).[22] *See also Hargraves v. Capital City Mortgage Corp.*, 140 F. Supp. 2d 7, 26 (D.D.C. 2000) ("Thus, whether the plaintiff is entitled to compensation may depend on the particular damages sought" but "the court cannot determine whether the plaintiff intends to seek non-compensable personal or emotional injuries"); *Nix v. Hoke*, 62 F. Supp. 2d 110, 116 (D.D.C. 1999) ("Moreover, courts have consistently read § 1964(c) to require that the plaintiff's injury be sustained to business or property.") (collecting cases); *Morrison v. Syntex Labs., Inc.*, 101 F.R.D. 743, 744 (D.D.C. 1984).

Pecuniary losses derived or arising from personal injuries are also not compensable under RICO. *See Doe v. Roe*, 958 F.2d 763, 767, 770 (7th Cir. 1992) ("[Plaintiff's] loss of earnings, her purchase of a security system and her employment of a new attorney are plainly derivatives of her emotional distress – and therefore reflect personal injuries which are not compensable

---

[22] The appellate courts from other Circuits are in accord. *See e.g., Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 422 (5th Cir. 2001) ("The phrase 'injury to business or property' excludes personal injuries"); *Hamm v. Rhone-Poulenc Rorer Pharm., Inc.*, 187 F.3d 941, 954 (8th Cir. 1999) (plaintiffs lacked standing because "[d]amage to reputation is generally considered personal injury and thus is not an injury to 'business or property' within the meaning of 18 U.S.C. § 1964(c)"); *Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997); *Bast v. Cohen, Dunn & Sinclair, PC*, 59 F.3d 492, 495 (4th Cir. 1995) ("An allegation of personal injury and pecuniary losses occurring therefrom are not sufficient to meet the statutory requirement of injury to 'business or property'" and upholding dismissal of RICO claims because plaintiff who alleged extreme mental anguish lacked standing); *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir. 1992) (en banc) ("[I]t is clear that personal injuries are not compensable under RICO"); *Doe v. Roe*, 958 F.2d 763, 767-68 (7th Cir. 1992) ("Not surprisingly, all other courts construing this language have likewise concluded that a civil RICO action cannot be premised solely upon personal or emotional injuries.") (collecting cases); *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 918-19 (3d Cir. 1991) (no recovery for personal injuries due to toxic waste exposure under RICO, because those were not damages to business or property); *Rylewicz v. Beaton Servs., Ltd.*, 888 F.2d 1175, 1180 (7th Cir. 1989); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989); *Grogan v. Platt*, 835 F.2d 844, 846-47 (11th Cir. 1988); *Drake v. B.F. Goodrich Co.*, 782 F.2d 638, 644 (6th Cir. 1986) (plaintiffs did not have standing under § 1964(c) because they had not alleged injury to business or property due to exposure to toxic chemicals); *Bankers Trust Co. v. Rhoades*, 741 F.2d 511, 515 (2d Cir. 1984) (physical injuries sustained in arson fire not recoverable under RICO, only damage to business or building) (dictum), *vacated on other grounds*, 473 U.S. 922 (1985).

under RICO"); *Grogan v. Platt,* 835 F.2d 844, 847-48 (11th Cir. 1988) (acknowledging that while personal injuries have economic consequences, pecuniary losses that are derivative of personal injuries are not "business or property" injuries under RICO).[23]

Here, conspicuously absent from the Complaint is any allegation of injuries, let alone specific injuries to business or property that are separate from her personal displeasure associated with the disclosure of what she considers to be "private" information in her video (without any economic losses derived therefrom). Ms. Roe attempts to do what the case law specifically disallows – dress up a basic complaint about the legitimate use of a video as an elaborate racketeering scheme. This is "exactly the type of bootstrapping use of RICO that federal courts abhor." *Williams v. Aztar Indiana Gaming Corp.*, 351 F.3d 294, 300 (7th Cir. 2003).

Leaving aside the lack of standing, plaintiff cannot satisfy the necessary RICO elements, warranting dismissal of the claim with prejudice.

**B.      There is no Actionable RICO "Pattern" Since Conduct with Respect to A Single Alleged Scheme And One Alleged Victim is Legally Insufficient.**

Controlling precedent forecloses a RICO claim focused on conduct in connection with a single scheme involving one victim, so plaintiff cannot satisfy the essential statutory element of a "pattern of racketeering activity." Here, Ms. Roe only alleges injury to one plaintiff, relating to one video, which is insufficient: "Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate offenses." *Sedima*, 473 U.S. at 496. Instead, Congress predicated liability on a "pattern of racketeering activity," and "[i]n normal usage, the word 'pattern' here would be taken to require more than

---

[23] The courts have further held that the "phrase 'business or property' . . . retains restrictive significance,'" *Bradley v. Phillips Petroleum Co.,* 527 F. Supp. 2d 625, 646 (S.D. Tex 2007) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)), so that "'[t]o state a claim under RICO, a plaintiff 'must allege facts demonstrating . . . that plaintiff's injury is to his business or property – and not physical, emotional[,], *or reputational harm or any economic aspect of such harm . . . .'*" *Bradley*, 527 F. Supp. 2d at 646 (quoting *Justin F. v. Maloney*, 476 F. Supp. 2d 141, 161 (D. Conn. 2007) (emphasis added)).

just a multiplicity of racketeering predicates." *H.J., Inc. v. Nw. Bell Tel.*, 492 U.S. 229, 238 (1989).

In construing this phrase, the Supreme Court has held that the "term 'pattern' itself requires the showing of a relationship between the predicates, and of the threat of continuing activity." *Id.* at 239 (internal citations and quotation marks omitted). Accordingly, "'[i]t is this factor of *continuity plus relationship* which combines to produce a pattern," and hence to establish a "pattern of racketeering activity a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *Id.* (emphasis in original) (internal quotation omitted). "The continuity element of a pattern of racketeering activity is crucial to a valid RICO claim in order to ensure that the crime alleged is the sort of offense that RICO is designed to address – one that is part of a pattern of ongoing, continued criminality or that involves criminality that promises to continue into the future." *Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1265 (11th Cir. 2004)

Thus, the D.C. Circuit has held that any RICO claim that is actually centered on a "single scheme, directed at few victims, 'and resulting in a single distinct injury,'" cannot satisfy the "pattern of racketeering" element. *Edmondson*, 48 F.3d at 1265 (citation omitted); *see also Western Assocs.*, 235 F.3d at 634 (affirming dismissal of RICO claim that "failed to satisfy the continuity prong of RICO's 'pattern of racketeering activity' requirement").

The D.C. Circuit, even though finding that certain RICO plaintiffs alleged an adequate number of predicate offenses by a tenant's association and its attorneys, "including bribery, extortion, wire and mail fraud, and interstate travel in aid of racketeering activity," affirmed the district court's ruling that their allegations were nonetheless legally insufficient to satisfy RICO's "pattern" requirement, because the complaint focused on only one principle "scheme – to prevent

32

or delay the sale of [an apartment building], or to secure a ransom for allowing the sale to proceed." *Edmondson* 48 F.3d at 1264-65. In addition, because the "scheme entail[ed] but a single discrete injury, the loss of the sale (or payment of the ransom), suffered by a small number of victims," the Court concluded that "*the combination of these factors (single scheme, single injury, and few victims) makes it virtually impossible for plaintiff[] to state a RICO claim.*" *Id.* at 1265 (emphasis added).

In *Western Assocs.*, the D.C. Circuit applied the same reasoning to hold that allegations that "for more than eight years" the defendant had "violated partnership agreements, transmitted fraudulent accounting statements, and stole the value of Western's partnership interest" resulting in "over $89 million in damages" could not meet the continuity prong of the pattern of racketeering activity. 235 F.3d at 630-31. The D.C. Circuit agreed that the complaint articulated "only a single scheme, a single injury, and a single victim (or single set of victims)." *Id.* at 634. Further, the court emphatically rejected the plaintiff's "vain attempt to make a RICO claim seem more viable by parsing one scheme into multiple schemes." *Id.* at 635.[24]

The holdings of *Edmondson* and *Western Associates* compel dismissal of Ms. Roe's RICO claim. Leaving aside the falsity of the accusations of copyright infringement, the instant

---

[24] The D.C. Circuit's reasoning has also been applied by many other courts in refusing to allow RICO claims focused on a single legal dispute. *See, e.g., Jackson,* 372 F.3d at 1267 (rejecting RICO claim against employer and attorneys where "[t]he alleged racketeering activity was related to the settlement of a *single* lawsuit, and, notably, was not designed to perpetrate racketeering with respect to a *series* of cases") (emphasis in original) (citing *Edmondson,* among other cases); *In re Burzynski,* 989 F.2d at 743 (dismissing a RICO claim for lack of a "pattern" where the "alleged predicate acts took place during the course of" a prior lawsuit); *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 244 (5th Cir. 1988) (affirming dismissal of a RICO claim where multiple acts of fraud were part and parcel of a single, discrete and otherwise lawful commercial transaction where the conduct did not constitute or threaten long-term criminal activity; *Bradley,* 527 F. Supp. 2d at 650 ("In this case, all of the alleged predicate acts took place during the settlement of claims associated with the '1999 lawsuit' . . . This conduct does not constitute or threaten long-term criminal activity. Moreover, where alleged RICO predicate acts are part and parcel of a single, otherwise lawful transaction, a 'pattern of racketeering activity' has not been shown.") (internal quotations omitted); *Utz v. Correa,* 631 F. Supp. 592, 595 (S.D.N.Y. 1986) ("[E]very action allegedly taken by the Attorney Defendants . . . was in the furtherance of an isolated fraudulent episode: an alleged scheme to defraud plaintiff into delivering the releases and the letter of apology in exchange for nothing of value. These misleading statements do not create a 'pattern' under RICO because they were merely parts of a 'single, unified activity.'") (quotation omitted).

lawsuit – which involves only a "single scheme, single injury, and [one] victim[]," *Edmondson*, 48 F.3d at 1265 – simply cannot survive as a viable RICO case. Indeed, Ms. Roe's racketeering claim specifically identifies only *one* actual "victim" – Ms. Roe herself – and, equally fatal, no concrete "injuries." Compl., *passim*. Therefore, where, as here, the only alleged activity that plaintiff can complain about was related to the prosecution of the *Phoenix* litigation, there can be no "pattern of racketeering" as a matter of law, and the RICO claims should be dismissed.

### C.   Proximate Cause is Fatally Lacking.

A RICO plaintiff is also required to show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (quoting *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992)). "Proximate cause for RICO purposes" must be "evaluated in light of its common-law foundations; proximate cause thus requires 'some direct relation between the injury asserted and the injurious conduct alleged.'" A link that is 'too remote,' 'purely contingent,' or 'indirec[t]' is insufficient." *Id.* (quoting *Holmes*, 503 U.S. at 271). The Supreme Court has repeatedly required dismissal of RICO claims that alleged violations that, even if arguably the "but for" cause of an asserted injury, relied on a theory of causation that was, as a matter of law, too "attenuated." *Id.* (quoting *Holmes*, 503 U.S. at 271); *accord Browning*, 292 F.3d at 248-49 (upholding dismissal of RICO claim because plaintiff "pleads no facts suggesting 'some direct relation between the injury asserted and the injurious conduct alleged' – in other words, proximate causation"); *Nix*, 62 F. Supp. 2d at 115 ("To recover under § 1964(c), a private plaintiff must show that the proximate cause of his injury is the defendant's conduct.").

In directing dismissal of a RICO claim in *Holmes*, the Supreme Court held that there must be a "*direct relation* between the injury asserted and the injurious conduct alleged,"

because the "less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 268-69; *see also Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 459-61 (2006) (applying these causation principles to preclude recovery of profits allegedly lost when a rival business was able to lower its prices by not charging the requisite tax on cash sales since the lost sales "could have resulted from factors other than [the defendants'] alleged acts of fraud").

In *Hemi*, the Supreme Court emphatically rejected another "attenuated" "causal theory" in a RICO case alleging that a vendor committed mail and wire fraud by failing to file required customer reports, resulting in a loss of "tens of millions of dollars in unrecovered cigarette taxes." *Hemi*, 559 U.S. at 4, 9. Finding that the City of New York "has no RICO claim" because it could not show that the tax revenue was lost "'by reason of' the alleged RICO violation," *id.* at 4, 18, the Court explained that the claim depended on several steps in a causal chain:

> as we reiterated in *Holmes*, '[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.' *Our cases confirm that the "general tendency" applies with full force to proximate cause inquiries under RICO. Because the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement.*

*Id.* at 10 (emphasis added) (internal quotations and citations omitted); *cf. Bridge v. Phoenix Bond & Indemn. Co.*, 553 U.S. 639, 659 (2008) (although a RICO claim based on mail and wire fraud need not assert reliance on the fraudulent statements, the plaintiff must assert how it was directly injured by a third party's reliance on the misrepresentation).

Applying these principles here, Ms. Roe obviously cannot (and does not) assert that she has suffered any injury to her "business or property" as a consequence of news reports regarding the *Phoenix* litigation or the video she gave to defendant Ren and other co-workers. Therefore, because it would be impossible for Ms. Roe to establish a "direct causal relationship" based upon

757874v.1

an "attenuated connection" between the alleged "scheme" and some undefined injury to business or property, her RICO claim should be dismissed.

### D.   The Complaint does not Allege a Distinct "Enterprise."

Plaintiff also cannot satisfy another essential element of a RICO claim – establishing the existence of a separate "enterprise," 18 U.S.C. § 1962(c), which is defined as "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact, although not a legal entity." *Id.* at § 1961(4). The "[c]ourts are in agreement that for purposes of liability under Section 1962(c), a RICO person must be distinct from the RICO enterprise." *Myers v. Lee*, No. 1:10CV131, 2010 WL 3745632, at *3 & n.3 (E.D. Va. Sept. 21, 2010); *Bates v. Nw. Human Servs.,* 466 F. Supp. 2d 69, 80 (D.D.C. 2006) ("The District of Columbia Circuit, along with eleven other Circuits, has conclusively held that the same entity cannot be [named as] the RICO enterprise and [as] a RICO defendant.") (citing *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 300 (D.C. Cir. 1993)). "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise" that is not simply the same "person" referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) (citation omitted).

Because there "must be 'some distinctness between the RICO defendant and the RICO enterprise,'" *Prunte v. Universal Music Group*, 484 F. Supp. 2d 32, 42 (D.D.C. 2007) (quoting *Cedric Kushner*, 533 U.S. at 161-62), and "liability depends on showing that the defendants conducted or participated in the conduct of the '*enterprise's* affairs,' not just their *own* affairs," *Reves*, 507 U.S. at 185 (emphasis in original), courts routinely dismiss RICO claims that "do[ ] not satisfy this test." *Prunte*, 484 F. Supp. 2d at 42.[25]

---

[25] *See also Yellow Bus Lines*, 913 F.2d at 951 (affirming dismissal based on a failure to satisfy the nonidentity requirement because "[l]ogic alone dictates that one entity may not serve as the enterprise and the person associated

757874v.1

The instant Complaint fails entirely to allege any distinction between the RICO persons themselves (namely, the law firm and its clients) and the so-called "enterprise." To the contrary, the pleading belies any such distinction by asserting that that the defendants – the RICO persons – collectively constituted an enterprise. Compl. ¶ 87 (alleging that "Ren, Bernabei and B&W are an 'enterprise' because they are in an association that shares a common interest, namely, the hope of a financial benefit from the [Phoenix] litigation. Each of the Defendants' interests are aligned, and each Defendant stands to profit from the unlawful use of Plaintiff's copyrighted material."); Compl. ¶ 88 ("In addition, B&W is an enterprise, in and of itself, because it is a legal entity in fact. The entity, and the individuals acting within it, shares a common interest of running a profitable law firm and winning lawsuits they file on behalf of their clients").[26]

Ms. Roe's Complaint fails to allege the requisite distinction that might support the existence of a "RICO enterprise that operates or functions in a way distinct from the defendants themselves." *Myers*, 2010 WL 3745632, at *4.[27] Therefore, this failure alone should lead to the

---

with it."); *Myers*, 2010 WL 3745632, at *4 ("The Amended Complaint fails to allege a RICO enterprise that operates or functions in a way distinct from the defendants themselves. There is a complete overlap between the defendants, their alleged agents, and the enterprise."); *Bates*, 466 F. Supp. 2d at 87-88 (dismissing RICO claim where the court "[could not] determine [from the allegations] whether the alleged RICO persons and the alleged RICO enterprises are sufficiently distinct").

[26] Such allegations are patently inadequate to establish an "enterprise." *Handeen v. Lemaire*, 112 F.3d 1339, 1351-53 (8th Cir. 1997); *Stephens, Inc. v. Geldermann, Inc.*, 962 F.2d 808, 816 (8th Cir. 1992) (no enterprise alleged where absent predicate acts the association had "no form or structure"); *Calcasieu Marine Nat'l Bank v. Grant*, 943 F.2d 1453, 1462 (5th Cir. 1991) ("An enterprise must be more than a summation of predicate acts."); *Goldfine v. Sichenzia*, 118 F. Supp. 2d 392, 401 (S.D.N.Y. 2000) (dismissing RICO claim because no allegation "of what activity, if any, the alleged enterprise ever engaged-in *other than* the alleged predicate acts") (emphasis in original).

[27] *See also Baker v. IBP, Inc.*, 357 F.3d 685, 691-92 (7th Cir. 2004) ("The nub of the complaint is that IBP operates *itself* unlawfully . . . . Without a difference between the defendant and the 'enterprise' there can be no violation of RICO.") (emphasis in original); *In re Burzynski*, 989 F.2d at 743 ("Can a 'RICO person' . . . employ or associate with itself? The answer appears to be 'no' with respect to a section 1962(c) claim. Under that subjection, RICO 'persons' must be distinct from the RICO 'enterprise.'"); *Bradley*, 527 F. Supp. 2d at 652 ("Having failed to allege an external enterprise, the . . . Plaintiffs have necessarily asserted that Defendants are 'employed by or associated with' themselves. Such identity of elements is impermissible for a RICO claim under §1962(c)."); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981) ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages."). In *Boyle v. United States*, 556 U.S. 938 (2009), the "Supreme Court liberally construed the structure requirements of an association-in-

37

dismissal of the RICO claims.[28]

## IV.   THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY UNDER THE NOERR-PENNINGTON DOCTRINE.

The Complaint clearly runs afoul of the *Noerr-Pennington* doctrine, which is predicated

on the First Amendment right to petition, and provides that "those who petition any department

of the government for redress are generally immune from statutory liability for their petitioning

conduct." *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). The "doctrine holds that

defendants who petition the government for redress of grievances, 'whether by efforts to

influence legislative or executive action or by seeking redress in court,' are immune from

liability for such activity under the First Amendment." *Nader v. Democratic Nat'l Comm.*, 555 F.

Supp. 2d 137, 156 (D.D.C. 2008) (quoting *Covad Commc'ns. Co. v. Bell Atl. Corp.*, 398 F.3d

666, 677 (D.C. Cir. 2005)), *aff'd on other grounds* 567 F.3d 692 (D.C. Cir. 2009)).

In *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129

(1961), the Supreme Court held that the Sherman Act could not lawfully be applied to a claim by

trucking companies that a coalition of railroads and their associates had illegally conspired to

"conduct a publicity campaign against the truckers designed to foster the adoption and retention

of laws and law enforcement practices destructive of the trucking business." *Id.* at 131. Although

the trucking companies alleged that the campaign against them was "vicious, corrupt, and

fraudulent," and specifically designed to "destroy [the plaintiffs] as competitors" in violation of

---

fact enterprise," but "did not alter the distinctiveness required between the RICO person and the RICO enterprise." *Myers*, 2010 WL 3745632, at *3 n.4.

[28] Also critically absent from the Complaint is any allegation of facts showing that defendants received income derived from a pattern of racketeering activity, or used or invested income from a pattern of racketeering activity to acquire an interest in or operate an enterprise, as required under Section 1962(a). *Danielsen v. Burnside-Ott Aviation Training Ctr.*, 941 F.2d 1220, 1229 (D.C. Cir. 1991) (plaintiff "must plead and prove that his injury flowed from the defendant's *use* or *investment* of racketeering income.") (emphasis in original); 18 U.S.C. § 1962(a) (plaintiff must allege that the defendant (1) received income derived, directly or indirectly, from a pattern of racketeering activity; (2) used or invested, directly or indirectly, any part of such income to acquire any interest in, or to establish or operate, any enterprise; and (3) is engaged in or affects interstate commerce. "It is not sufficient to allege injury flowing from the predicate acts of racketeering." *Danielsen*, 941 F.2d at 1229.

the Sherman Act, the Court held that the railroads' efforts to "influence legislation" and otherwise affect public policy could not be deemed unlawful without bringing the Sherman Act in tension with the First Amendment. *Id.* at 129-30, 137-38. The Court reasoned that:

> [I]n a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives . . . . *The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade those freedoms . . . . For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws.*

*Id.* at 137-38 (emphasis added); *accord United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent of purpose . . . . Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition. Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

It has long been settled that the pursuit of litigation is petitioning activity presumptively entitled to *Noerr-Pennington* immunity. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972); *Oregon Natural Resources Council v. Mohla*, 944 F.2d 531, 535 n.3 (9th Cir. 1991) (litigation by an environmental organization that sought to "achieve a political goal of preventing the cutting of old-growth forest" was entitled to *Noerr-Pennington* immunity) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914-15 (1982); *see also Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1183 (9th Cir. 2005) ("The [*Noerr-Pennington*] doctrine extends to all three branches of government, and thus exempts bringing a lawsuit – that is, petitioning a court – from . . . liability.); *Sosa*, 437 F.3d at 930, 933 (ruling that "communication[s] to the court" are "petitions" within the protection of the First Amendment).

Moreover, *Noerr-Pennington* immunity also extends to news campaigns. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499-500 (1988) ("[A] publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity [under *Noerr*]."). More recently, the Supreme Court has expressly extended *Noerr-Pennington* "immunity principles" to "situations where groups 'use . . . *courts* to advocate their causes and points of view,'" including litigation against both government agencies and private parties. *BE & K Constr. Co. v. N.L.R.B.*, 536 U.S. 516, 525 (2002) (emphasis in original) (quoting *Cal. Motor Transp.*, 404 U.S. at 511). The Court has explained that:

> [T]he same philosophy [underlying *Noerr*] governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature, and arms of the executive) and to courts, the third branch of Government. *Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right to petition.*

*Cal. Motor Transp.*, 404 U.S. at 510 (emphasis added). Thus, the Supreme Court "conclude[d] that it would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view. . . ."). *Id.*; *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983) (limiting the ability of the NLRB to penalize the filing of lawsuits against employees because "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances" and "[w]e should be sensitive to these First Amendment values in construing the [National Labor Relations Act] in the present context").

Title VII and its "citizen suit provision" "encourages private parties . . . to act as 'private attorneys general'" in order "to enforce the Act's provisions for the benefit of the public interest as a whole" – which imposes a particularly high hurdle for plaintiff to overcome to avoid the

presumption of *Noerr-Pennington* immunity. *Coastal States Marketing v. Hunt*, 694 F.2d 1358, 1372 (5th Cir. 1983) ("A litigant should enjoy petitioning immunity from the antitrust laws so long as a genuine desire for judicial relief is a significant motivating factor underlying the suit.").

Both the Supreme Court and D.C. Circuit have applied this doctrine in the context of employment-related unfair labor practice claims.[29] Although the D.C. courts have not yet applied *Noerr-Pennington* to the enforcement of civil rights statutes, other federal courts have.[30] The immunity has also been held to bar intellectual property claims in the related context of the Lanham (Trademark) Act, 15 U.S.C. § 1051 *et seq. Sliding Door Co. v. KLS Doors, LLC*, No. CV 13–00196 JGB, 2013 WL 2090298, *7 (C.D. Cal. May 1, 2013) (barring a false advertising claim brought under Lanham Act as inconsistent with the *Noerr-Pennington* doctrine); *Thermos Company v. Igloo Products Corp.*, No. 93 C 5826, 1995 WL 745832, *5-6 (N.D. Ill. Dec. 13, 1995) (antitrust counterclaim barred by *Noerr* in trademark case).

Here, the pursuit of the underlying *Phoenix* litigation and any attendant advocacy in the community and the public relations domain – which involve legal advocacy pertaining to significant and important issues, namely to redress and remedy a pattern of sexual harassment, assault and retaliation – was indeed an "objectively plausible effort to enforce rights." *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indust., Inc.*, 508 U.S. 49, 65 (1993); *see also*

---

[29] *See BE & K Constr.*, 536 U.S. 516; *Venetian Casino Resort, LLC v. N.L.R.B.*, 484 F.3d 601, 612 (D.C. Cir. 2007).

[30] *See, e.g., New West, L.P. v. City of Joliet*, 491 F.3d 717, 721-22 (7th Cir. 2007) (housing discrimination); *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000) ("[T]he *Noerr–Pennington* doctrine . . . is based on and implements the First Amendment right to petition and therefore, with one exception [labor law for incidental conduct] applies equally in all contexts."); *Pathways, Inc. v. Dunne*, 172 F. Supp. 2d 357, 366 (D. Conn. 2001), *aff'd in part on other grounds*, 329 F.3d 108 (2d Cir. 2003) (Fair Housing Act); *Nazir v. United Air Lines*, No. CV 09–01819 CRB, 2009 WL 2912518, *2-5 (N.D. Cal Sept. 9, 2009) (Title VII); *Ungureanu v. A. Teichert & Son*, No. CIV S–11–0316 LKK GGH PS, 2012 WL 1108831, *7-9 (E.D. Cal. Apr. 2, 2012) (same); *Boulware v. State of Nev., Dept. of Human Res.*, 960 F.2d 793, 800 (9th Cir. 1992) (civil rights). The doctrine has been applied to bar yet other types of claims. *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 159–160 (3d Cir. 1988) (immunity applied to conspiracy and abuse of process); *Havoco of Am., Ltd. v. Hollobow*, 702 F.2d 643, 649 (7th Cir. 1983) (tortious interference with business relationships claim barred by immunity).

*Sosa*, 437 F.3d at 934 ("[I]n the litigation context, not only petitions sent directly to the court in the course of litigation, but also 'conduct incidental to the prosecution of the suit' is protected by the *Noerr-Pennington* doctrine.") (quotation omitted).

It could not be more clear that *this* far-reaching copyright and RICO case serves to "stifle public debate" on a matter of "public concern" – which, as the Supreme Court has recently reaffirmed, affords a compelling First Amendment defense to civil litigation. *Snyder v. Phelps*, 562 U.S. __, 131 S. Ct. 1207, 1220 (2011). In *Snyder*, the Supreme Court addressed whether various tort claims, including one for "civil conspiracy," could be successfully pursued against picketers who, near a soldier's funeral, held up signs with messages such as "Thank God for IEDs" and "God Hates You." 131 S. Ct. at 1213. The Court held that, because the picketing addressed matters of "public concern" and "public import," it was necessarily insulated from tort liability by virtue of the First Amendment. *Id.* at 1217. Thus, the Court explained, "[a]s a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Id.* at 1220. If the "particularly hurtful" speech at issue in *Snyder* warranted broad First Amendment protection from civil liability, then public advocacy aimed at exposing and remediating unlawful employment practices is surely deserving of such solicitude.

Therefore, all actions undertaken by defendants are entitled to *Noerr-Pennington* immunity regardless of plaintiff's spurious allegations of some perceived impropriety and copyright infringement.

## V.    DEFENDANTS SHOULD BE AWARDED ATTORNEYS' FEES AND COSTS.

Pursuant to Section 505 of the Copyright Act, a court may award costs and attorneys' fees to the prevailing party in a copyright infringement action. *See* 17 U.S.C. § 505 ("Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs."). In exercising its discretion, a court should consider factors

such as frivolousness, the party's motivation, objective unreasonableness of the non-prevailing party and "the need in particular circumstances to advance considerations of compensation and deterrence." *Fogerty*, 510 U.S. at 534 n.19 (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)); *see also* 3 Nimmer, § 14.10[D][2][b] (1996). Applying this standard, the courts in this jurisdiction have awarded attorney's fees and costs under Section 505 to prevailing defendants in copyright infringement actions. *See, e.g., Scott-Blanton v. Universal City Studios Productions, LLP*, 593 F. Supp. 2d 171 (D.D.C. 2009); *Newborn v. Yahoo! Inc.*, 437 F. Supp. 2d 1 (D.D.C. 2006); *Pannonia Farms, Inc. v. Re/Max Int'l, Inc.*, 407 F. Supp. 2d 41 (D.D.C. 2005).

Here, defendants have been forced to defend themselves in two different judicial fora and to incur the attendant expense of filing multiple motions to dismiss – first when plaintiff filed her copyright action in the obviously wrong forum (D.C. Superior Court), and now again in federal court to address patently frivolous copyright infringement claims – most notably because there is no standing, no originality, no copyrightability and no damages. As a result, defendants have been unjustly forced to incur the expense of defending against plaintiff's spurious allegations and, for this reason, they respectfully request that the Court order plaintiff to pay the reasonable costs and attorneys' fees that they incurred in this matter.

## CONCLUSION

At the end of the day, this lawsuit is not about copyright infringement or racketeering. Rather, what plaintiff really has is a misdirected and unsubstantiated complaint about the publication of a video that she voluntarily gave to defendant Ren and other co-workers without any restrictions on its use. Her belated interest in privacy is not an interest protected by the Copyright Act or the RICO statute. For all of the above reasons, the Complaint suffers from numerous insurmountable legal flaws and should be dismissed with prejudice.

757874v.1

Respectfully submitted

WILSON,      ELSER,      MOSKOWITZ,
EDELMAN & DICKER LLP


By  /s/ Laura N. Steel
     Laura N. Steel, Esquire (D.C. Bar No. 367174)
     700 11th Street, NW, Suite 400
     Washington, DC 20001
     Phone: 202-626-7660
     Fax: 202-628-3606
     Laura.Steel@wilsonelser.com
     Counsel for defendants Lynne Bernabei and
     Bernabei & Wachtel, PLLC

44